FILED
2017 Jul-17  PM 01:41
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| **URBAN SPORTS & ENTERTAINMENT GROUP, LLC** | |
| **Plaintiff,** | **COMPLAINT** |
| **v.** | **Civil Action No. _____** |
| **SOUTHWESTERN ATHLETIC CONFERENCE** | **JURY DEMAND REQUESTED** |
| **Defendant.** | **2:17-cv-01188-MHH** |

Now Comes Plaintiff, Urban Sports & Entertainment Group, LLC, complaining of Defendant Southwestern Athletic Conference ("SWAC") as follows:

### STATEMENT OF JURISDICTION

1.     Plaintiff Urban Sports & Entertainment Group, LLC ("Urban Sports") is a citizen of North Carolina being a limited liability corporation incorporated under the laws of the State of North Carolina with its principal place of business located in Mecklenburg County, North Carolina.

2.     Defendant is a citizen of Alabama being a corporation incorporated under the laws of the State of Alabama with its principal place of business located in Birmingham, Alabama.

3.     The amount in controversy, without interest and costs, exceeds the sum and value specified by 28 U.S.C. § 1332(a).

## STATEMENT OF FACTS

4.      Urban Sports is engaged in the business of broadcast television, internet and all other media production, promotion, distribution and execution of sporting and other entertainment events, event management and sponsorship development.

5.      Urban Sports has provided these services to the SWAC for the past five years.

6.      Each year, Urban Sports expended substantial time and effort negotiating new sponsorship contracts on behalf of the SWAC.

7.      Pursuant to the contract between Urban Sports and the SWAC, titled the "Rights Agreement," Urban Sports was entitled to a Management Fee for its Management Services (as defined in the Rights Agreement) as well as commissions for "any Sponsorship contract originated by Urban Sports and entered into by the SWAC." See Exhibit A, which is a true and accurate copy of the Rights Agreement.

8.      Paragraphs 4(a) and 4(b) of the Rights Agreement contains two commission schedules, depending on length of time and value of the contract.

9.      Prior to June of 2016, the course of dealing between the SWAC and Urban Sports was for Urban Sports to contract directly with the sponsor and receive payment for the sponsorship contract. Urban Sports would then withhold its commission and make the remaining payment to the SWAC.

10.      The SWAC chose not to renew the contract with Urban Sports after June 30, 2016.

2

11.     Because Urban Sports would not represent the SWAC after June 30, 2016, the sponsorship contracts for 2016-2017 were signed directly with the SWAC instead of Urban Sports. After the SWAC received payments from the sponsor, it would then make the commission payment to Urban Sports.

12.     Prior to entering into the Rights Agreement with Urban Sports, the SWAC had no relationship with Toyota.

13.     Urban Sports originated a relationship between Toyota and the SWAC.

14.     In 2013, 2014 and 2015, Urban Sports negotiated sponsorship agreements with Toyota on behalf of the SWAC.

15.     In 2014, Urban Sports received a commission on the sponsorship agreement with Toyota for the 2013-2014 season in the amount of $65,200.00

16.     In 2015, Urban Sports received a commission on the sponsorship agreement with Toyota for the 2014-2015 season in the amount of $56,491.12

17.     The SWAC has withheld the commission payment owed on the sponsorship contract with Toyota for the 2016-2017 season

18.     Urban Sports did all of the legwork and negotiation for the Toyota contract in 2013, 2014, 2015 and 2016.

19.     The contract with Toyota for the 2015-2016 season was for $282,460.

20.     In 2015, Urban Sports was paid a 20% commission from the 2015-2016 contract in the amount of $56,492.

21.     Due to Urban Sports' negotiations, the 2016-2017 season contract was 20% higher than the 2015-2016 season contract and valued at $350,000.

3

22.     Urban Sports kept the SWAC Commissioner Duer Sharp in the loop during the negotiations with Toyota for the higher amount.

23.     Urban Sports finalized the contract with Toyota and sent the final document to Commissioner Sharp prior to the end of its contract term, i.e., June 30, 2016.

24.     Commissioner Sharp intentionally led Urban Sports to believe it would receive a commission on the Toyota Contract, knowing that he was going to delay signing the contract until after June 30, 2016.

25.     Following numerous attempts at communication by Urban Sports after June 30, 2016, Commissioner Sharp confirmed that the SWAC and Toyota did execute a contract.

26.     Commissioner Sharp has refused to communicate the final number on the Toyota Contract or send the commission.

27.     The SWAC entered into an agreement with Toyota for the 2016-2017 season.

28.     The SWAC signed a contract with Toyota in 2016.

29.     Because the Toyota contract was "originated by Urban Sports and entered into by the SWAC," Urban Sports is entitled to a 20% commission on the gross Sponsorship Fee under Paragraph 4(a)(ii) of the Rights Agreement. The commission owed is at least $70,000.

4

30.     In addition to the Toyota commission, Urban Sports is entitled to the pro-rata portion of the management fee for negotiating agreements and managing clients after June 30, 2016.

31.     The prorated amount due for Urban Sports' management services after June 30, 2016 is $6,250.

32.     The total amount due and owing to Plaintiff for its services is $76,250.00.

33.     Defendant has refused and continues to refuse to pay the amounts due and owing despite reasonable demands therefore.

## FIRST CLAIM FOR RELIEF
### Breach of Contract

34.     Plaintiff incorporates by reference, repeats and realleges each and every allegation contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

35.     Defendant sought Plaintiff and engaged it to provide management services and sponsorship contracts.

36.     Defendant signed and agreed to a Management Fee and a Commission Schedule contained in the Rights Agreement.

37.     Plaintiff completed the work pursuant to the Rights Agreement.

38.     Defendant has failed and refused to compensate Plaintiff as set forth in the Rights Agreement and outlined herein.

39.     As a result of Defendant's breach of contract, Plaintiff is damaged in the amount of $76,250.00.

5

## SECOND CLAIM FOR RELIEF
### Quantum Meruit

40.     Plaintiff incorporates by reference, repeats and realleges each and every allegation contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

41.     The Plaintiff, at the request of the Defendant, incurred significant time and effort in the negotiation of the Toyota contract.

42.     The Plaintiff, at the request of the Defendant, incurred significant time and expense in Management Services after the termination of the Rights Agreement on June 30, 2016.

43.     The Plaintiff's work was not gratuitous and was for the benefit of Defendant.

44.     The work performed by Plaintiff is valued at $76,250.00 as represented by the invoices.

45.     Defendant has failed and refused to pay Plaintiff for its services.

## THIRD CLAIM FOR RELIEF
### Unjust Enrichment

46.     Plaintiff incorporates by reference, repeats and realleges each and every allegation contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

47.     The Defendant knew that Plaintiff was negotiating a sponsorship contract with Toyota on its behalf.

6

48.     The Defendant permitted Plaintiff to spend substantial time and effort negotiating the Toyota contract knowing that it had no intention of paying Plaintiff the 20% commission owed.

49.     Plaintiff relied on Defendant's actions and statements during the negotiations of the Toyota contract.

50.     The material terms of the Toyota contract and a final draft of the contract were completed prior to June 30, 2017.

51.     The Defendant willfully and intentionally refused to sign the contract prior to June 30, 2017 so it could argue that Plaintiff was not entitled to the commissions on the contract.

52.     Defendant concealed its true intention from Plaintiff.

53.     Plaintiff relied on the wrongful conduct of the Defendant.

54.     The Plaintiff should have been paid $70,000 of the $350,000 from the Toyota contract.

55.     Plaintiff should have been paid for its management services after June 30, 2017.

56.     Defendant was unjustly enriched in the sum of $76,250.00.

### FOURTH CLAIM FOR RELIEF
### Breach of Covenant of Good Faith and Fair Dealing

57.     Plaintiff incorporates by reference, repeats and realleges each and every allegation contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

58.     An enforceable contract existed between Plaintiff and Defendant.

7

59.     Defendant was obligated to act in good faith and fair dealing under the contract.

60.     Defendant intentionally frustrated the performance of the contract by intentionally refusing to sign the Toyota sponsorship agreement until after June 30, 2017.

61.     Defendant has failed and refused to pay Plaintiff its commission because the Toyota contract was signed after June 30, 2017.

62.     Payment under the Rights Agreement is not conditioned on when the sponsorship agreement is signed, but instead, on whether the sponsor was originated by the Plaintiff.

63.     Plaintiff has been damaged by Defendant's breach of the covenant of good faith and fair dealing in the amount of $76,250.00.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff demands Judgment against the Defendant in the amount of $76,250.00, plus interest and penalties as alleged herein until paid in full, plus the costs incurred in this action, including reasonable attorneys' fees.

This the 14th day of July, 2017

By:     _____
        Rodney E. Miller (ASB-0130-R73M)
        MCCALLUM, METHVIN & TERRELL, P.C.
        2201 Arlington Avenue South
        Birmingham, Alabama 35205
        Telephone: (205) 939-0199
        Facsimile: (205) 939-0399
        rem@mmlaw.net

Michelle Massingale Dressler (*Pro Hac to be filed*)
SELLERS, AYERS, DORTCH AND LYONS, P.A.
410 Cameron-Brown Building
301 South McDowell Street
Charlotte, NC 28204-2686
Telephone: (704) 377-5050
Facsimile: (704) 339-0172

**DEFENDANTS TO BE SERVED VIA PROCESS SERVER AT:**

Southwestern Atlantic Conference
c/o Registered Agent, Duer Sharp
2101 Sixth Avenue North, Suite 700
Birmingham, Alabama  35203

# EXHIBIT A

## URBAN SPORTS & ENTERTAINMENT GROUP, LLC

### RIGHTS AGREEMENT

**THIS RIGHTS AGREEMENT** (the "Agreement") is made as of the 1st day of July, 2015, by and between **URBAN SPORTS & ENTERTAINMENT GROUP, LLC**, a North Carolina limited liability company ("Urban Sports"), and the **SOUTHWESTERN ATHLETIC CONFERENCE**. an Alabama not-for-profit corporation ("SWAC"). Urban Sports and SWAC are each sometimes referred to herein as a "Party" and collectively as the "Parties."

### RECITALS

**WHEREAS,** Urban Sports is engaged in the business of broadcast television, internet and all other media production, promotion, distribution and execution of sporting and other entertainment events, event management, and sponsorship development;

**WHEREAS,** the SWAC is a collegiate athletic conference made up of the member education institutions (the "Member Institutions") set forth on **Schedule A** attached to this Agreement, which Member Institutions have previously granted in writing to the SWAC the exclusive right to grant to a third party, such as Urban Sports, the rights set forth in this Agreement;

**WHEREAS,** the SWAC desires to grant to Urban Sports and Urban Sports desires to accept from the SWAC sole and exclusive third party rights to solicit, sell, distribute, promote and execute sponsorship packages (individually "Sponsorship", collectively "Sponsorships") including but not limited to television commercial spots, in-game promotions, and ancillary event sponsorships on a worldwide basis for (i) all SWAC championship events in all male and female varsity athletics, and (ii) all game related events arising in connection with SWAC championship events, all as more particularly set forth in this Agreement;

**WHEREAS,** the SWAC desires to engage Urban Sports as the sole and exclusive management agency for the SWAC including but not limited to management, public relations, branding, promotions development and activation, and corporate partner and sponsor solicitation as more particularly set forth in this Agreement;

**WHEREAS,** nothing in this Agreement shall supersede or interfere with the rights previously granted by the SWAC to ESPN, its networks, partners, or affiliates, or any other previously established partners or sponsors of the SWAC;

**NOW, THEREFORE,** for and in consideration of the mutual promises set forth in this Agreement, the Parties agree as follows:

1.      **Management Services**. The Parties agree that Urban Sports will be responsible for the following services (the "Management Services"), subject to the approval of the SWAC, in its sole and exclusive discretion, for any activities undertaken herein, other than those expressly set forth and specifically defined:

        a.  Promotion of the SWAC and SWAC championships as described below

b. Management of all sponsorship activation at football and basketball SWAC Championships

c. Implement strategy for event operations related to all sponsorship activation, game formats for television and floor promotions, ticket sales initiatives, ancillary events and marketing plan

d. Develop and solicit Sponsorships, as set forth more fully in Section 2 below

e. Create sales presentations for ancillary programs

f. Develop and manage overall SWAC championships brand

g. Manage existing client partnerships (sponsors, televisions networks, radio networks)

h. Provide weekly sales and client development reports to the SWAC

i. Develop and manage group ticket sales and ticket package strategy for SWAC championships

j. Manage all sponsorship activation on game day to include:

    (i)    Sponsorship activation area

    (ii)    Pre-game festivities (photo ops, coin tosses, fly-ins, etc.)

    (iii)    In-game sponsor activation (time-outs and between quarters)

    (iv)    Post-game presentations

        (1)    The Parties will mutually agree, by way of an amendment to this Agreement, an incremental budget for a SWAC Mobile Marketing Tour.

2.    **Sponsorships**. The SWAC and Urban Sports have the right on a co-exclusive basis to promote and sell Sponsorships of SWAC events to third parties ("Sponsors"). In return for an anticipated return on investment through increased name recognition and product use among fans of the SWAC, Sponsors shall be identified and solicited by each of the Parties to become Sponsors of certain SWAC events. The Parties agree to mutually agree upon the minimum requirements to be a Sponsor, not to be unreasonably withheld. The Parties agree to cooperate and coordinate in the solicitation and sale of the Sponsorships, such that neither Party during the Term of this Agreement will solicit or negotiate with a potential or existing Sponsor that has been identified in writing in advance by one Party to the other, and to the extent that both Parties identify a Sponsor to the other at the same time, the Parties will coordinate the solicitation and sale process. SWAC shall retain the reasonable discretion to reject any potential Sponsor which does not meet with its ideals, morals or purpose, or those of the Member Institutions.

3.     **Management Fee**. In partial consideration of Urban Sports performing the Management Services set forth in Section 1 above the SWAC will pay Urban Sports a fee in the amount of One Hundred Fifty Thousand Dollars ($150,000.00) (the "Management Fee"), as outlined in **Schedule B** attached hereto and made a part hereof, for the first year of the Term with a three percent (3%) increase each subsequent year of the Term (as defined below).

4.     **Sponsorship Commissions**.     The SWAC agrees to pay Urban Sports Sponsorship Commissions ("Commissions") as follows:

a.     **Annual Sponsorships.** The SWAC agrees to compensate Urban Sports according to the commission schedule set forth below for any Sponsorship contract originated by Urban Sports and entered into by the SWAC of one year or less in length:

(i)     A fifteen percent (15%) Commission on gross Sponsorship fees up to two hundred fifty thousand $250,000; and

(ii)     A twenty percent (20%) Commission on gross Sponsorship fees above two hundred fifty thousand dollars ($250,000).

b.     **Multi-year Sponsorships**. The SWAC agrees to compensate Urban Sports according to the commission schedule set forth below for any Sponsorship contract originated by Urban Sports and entered into by the SWAC greater than one year in length:

(i)     A twenty percent (20%) Commission on gross Sponsorship fees for the first year of the contract; and

(ii)     A fifteen percent (15%) Commission on gross Sponsorship fees for the second year and each subsequent year of the contract.

c.     The SWAC agrees to compensate Urban Sports with a ten percent (10%) Commission on in-kind Sponsorships based on value of in-kind product.

d.     The SWAC agrees to compensate Urban Sports, in accordance with the commission structures put forth above, on increased revenue of existing sponsors. The Parties agree the Existing Sponsors and Existing Sponsor Spending as set forth in **Schedule C.**

e.     Notwithstanding the above, the SWAC and Urban Sports will work together to solicit and enter into local sponsorships ("Local Sponsorships"), for which Urban Sports shall be entitled to commissions as outlined above and as mutually agreed upon, in the event Urban Sports originates any Local Sponsorships. Local sponsorships are defined as companies doing business primarily or exclusively in the Houston and Dallas Texas markets. These markets may change from time-to-time, as mutually agreed upon in writing, depending on the location of the SWAC Football Championship and Basketball Tournament venues.

f.     The SWAC agrees to defer regional and national sponsorship inquiries to Urban Sports and retain only local sponsorship inquiries for its sole efforts.

3

g. Sponsorship activation "hard costs," which include, but are not limited to access fees certain events, game tickets, and other approved activation costs as mutually agreed upon between Urban Sports and the SWAC and built into the sponsorship packages.

h. Urban Sports shall return to SWAC all revenue (net of expenses) associated with the agreed upon activation hard costs.

i. Urban Sports will be responsible for activation of sponsor-driven promotions.

5.     **Term**.  Unless earlier terminated in accordance with Section 7 below, this Agreement is effective July 1, 2015 through June 30, 2016 (the "Term").

6.     **Right of First Negotiation Concerning Renewal of Agreement.**  Commencing on April 1, 2016 the SWAC shall negotiate exclusively with Urban Sports in good faith for a period of ninety (90) days (the "Negotiating Period") (Provided either Party did not exercise its rights as set forth in Section 7 below), for an extension of this Agreement with substantially the same terms as set forth herein.  If at the end of the Negotiating Period, Urban Sports and the SWAC have not reached agreement, the SWAC shall promptly notify Urban Sports of the terms on which it is then willing to extend this Agreement.  Such notice shall contain an offer (the "Renewal Offer") to contract with Urban Sports on such terms and Urban Sports shall have a period of thirty (30) days from Urban Sports' receipt of the Renewal Offer.  If Urban Sports does not accept the Renewal Offer, the SWAC may enter into an agreement with any third party with respect to such rights and services.

7.     **Termination**

a. Urban Sports may terminate this Agreement at any time upon written notice to the SWAC in the event that the SWAC materially breaches any term, condition, covenant, or representation set forth herein, and such breach continues uncured for a period of forty-five (45) days following written notice thereof (which notice must specify the nature of the alleged breach); provided, however, that with respect to any default in payment of any amount due Urban Sports hereunder, Urban Sports may terminate this Agreement upon written notice to the SWAC in the event such default in payment continues uncured for a period of ten (10) days following written notice thereof.  Upon the occurrence of any breach by the SWAC of any term, condition, covenant, or representation set forth herein, without respect to any cure period provided herein, Urban Sports may, at its sole election, suspend all performance under this Agreement, pending the passage of any applicable cure periods or the correction of the applicable breach.  If the applicable breach is corrected within the respective cure period, Urban Sports shall be required to resume performance.

b. The SWAC may terminate this Agreement at any time upon written notice to Urban Sports in the event that Urban Sports materially breaches any term, condition, covenant, or representation set forth herein, and such breach continues uncured for a period of forty-five (45) days following written notice thereof (which notice must specify the nature of the alleged breach),provided, however, that following written

notice of such a breach by Urban Sports of any term, condition, covenant, or representation set forth herein, without respect to any cure period provided herein, SWAC may, at its sole election, suspend all performance under this Agreement (including any payment owed to Urban Sports), pending the passage of any applicable cure periods or the correction of the applicable breach. If the applicable breach is corrected within the respective cure period, SWAC shall be required to resume performance, including payment of any amounts previously withheld or owed.

8.    **Survival.**   Notwithstanding any termination of this Agreement for any reason whatsoever, the provisions of <u>Sections 7, 8, 9, 10, 11, 12, 13, 15</u>, and <u>16</u>, and any other provisions of this Agreement necessary to give efficacy thereto, or which by their nature, are intended to survive, will continue in full force and effect following any such termination.

9.    **License and Use of Marks.**

   a. The SWAC hereby grants Urban Sports for the Term of the Agreement a fully-paid, nontransferable, non-exclusive, royalty-free license to use and sublicense, strictly in accordance with (and strictly for the sole purpose of allowing Urban Sports to fulfill) the terms of this Agreement, all of the SWAC's names, logos, marks, trademarks, copyrights or service marks shown on <u>Schedule C</u> (collectively, the "SWAC Intellectual Property") in connection with the services set forth herein and any publicity, promotion, advertising, or merchandising sales with respect to the such events contemplated hereby, and with respect to the Management Services described in <u>Section 1</u> above.

   b. Urban Sports hereby grants to the SWAC a non-exclusive, non-transferable, royalty-free license to use Urban Sport's name, logos, service marks and trademarks as shown on <u>Schedule D</u> (the "Urban Sports Trademarks"), subject to the requirement that all proposed use of the Urban Sports Trademarks must be pre-approved in writing by Urban Sports.

10.   **Ownership and Future Exploitation of Programs.**   Urban Sports shall be the sole and exclusive owner of the Inside the Game television shows (the "Programs"), and all constituent elements thereof including without limitation, all titling, portions, recordings, extractions, and duplications, in whatever format or medium. Except as otherwise provided herein with respect to copyrights, marks, logos, service marks, tradements and similar intellectual property owned by the SWAC and being licensed to Urban Sports by the SWAC herein, Urban Sports shall be the exclusive owner of all copyrights, marks, logos, service marks, trademarks, and similar intellectual property comprising the Programs. Except as set forth herein, the SWAC and the Member Institutions shall not have any interest with respect to the use of the Programs. Any use of the Programs by any party without the express written consent of Urban Sports is strictly prohibited. After the initial broadcast of the Programs, Urban Sports shall have the sole and exclusive right to exploit the Programs for all purposes, including but not limited to the right to repackage, reproduce, reconstitute, redistribute and resell the Programs or any elements of the Programs in any revised format and by any means whatsoever.

\12690756.2

11.     **Confidential and Proprietary Information**.  Urban Sports and the SWAC agree not to divulge or permit or cause their officers, directors, stockholders, employees or agents to divulge the terms and substance of this Agreement, except to their representatives and attorneys in the course of any legal proceedings to which either of the parties hereto is a party for the purpose of securing compliance with this Agreement or as may otherwise be required by law in the opinion of counsel for the party required to make such disclosure.  The terms of this Agreement shall constitute the Confidential Information of both parties.

a.  Duty to Maintain Confidentiality.  Each Party (the "Receiving Party") hereby acknowledges that during the Term, the other Party (the "Delivering Party") may disclose to the Receiving Party (intentionally or inadvertently) Confidential Information (as defined below) of the Delivering Party.  The Receiving Party hereby agrees to keep the Confidential Information strictly confidential and use the Confidential Information only for legitimate business purposes in carrying out its obligations under this Agreement.

In addition, except to the extent that the use or disclosure of any Confidential Information is required to fulfill its obligations or to enforce its rights, under this Agreement, during the Term and after its expiration, the Receiving Party agrees that it will not:

(i)     Misappropriate, use for the purpose of competing with the Delivering Party, either directly or indirectly; disclose to any third party, either directly or indirectly; or aid anyone else in disclosing to any third party, either directly or indirectly; all or any part of any Confidential Information; or

(ii)    Use, disclose, divulge or communicate directly or indirectly to any third party:  (1) the names, addresses and other contact data regarding any clients, or sponsors of the Delivering Party; or (2) the details of any contracts, business transactions or negotiations to which the Delivering Party is a party or of any tenders, offers or proposals submitted or to be submitted by the Delivering Party in connection with its business.

b.  Definition of Confidential Information.  The term "Confidential Information" means confidential and proprietary business or technical information furnished to or obtained by the Receiving Party regarding the Delivering Party, a client of thereof, or the Management Services during the Term.  Such Confidential Information includes, by way of illustration, but is not limited to: (i) any Delivering Party's information regarding a client, including but not limited to client lists, contracts, business transactions, products or services provided by the Delivering Party to such clients; or (ii) all financial information concerning a Delivering Party; or (iii) all marketing and sales information, including, but not limited to, information regarding sponsors and advertisers, supplier/sponsor lists, sponsorship terms, contracts, and similar information; or (iv) all plans and projections for business opportunities for new or developing business of the Delivering Party, including but not limited to marketing concepts and business plans; or (v) all marketing techniques developed by the Delivering Party; or (vi) all information relating to the Delivering Party's products,

6

prices, costs, pricing strategies, employee lists, personnel matters, organizational structure of the Delivering Party, and other confidential or proprietary information. "Confidential Information" will not include information that is generally known or available to the public, except to the extent of an unauthorized disclosure by a Party with a duty of confidentiality to the Delivering Party.

c. Return of Information. The Receiving Party agrees that it will return upon the Delivering Party's request at any time all documents, written material, information, products, devices, and other property belonging to the Delivering Party, as well as all documents and other materials of any kind, that constitute or contain any Confidential Information, in possession or control of it or its employees or agents.

d. Duration of Confidentiality Obligations. The Receiving Party will maintain and keep all Confidential Information strictly confidential throughout the duration of the Term and thereafter for three (3) years. In addition, each Party hereto agrees that the provisions of this Section 12 (d) will survive the expiration of the Term, regardless of the date, reason, or manner of expiration or termination thereof.

12. **Agreement Not to "Raid" or Engage Employees/Consultants.** Each Party hereto covenants and agrees that during the Term and for the period of three (3) years after the expiration or termination of this Agreement for any reason, such Party will not, whether on behalf of any other entity or on its own behalf: (a) hire or engage or attempt to hire or engage for employment or as an independent contractor any employee engaged by the other Party during the Term or during such three (3) year period thereafter; and/or (b) solicit, encourage or support any such employee or any consultant to leave their employment or independent contractor relationship with the other Party.

13. **Subcontractors.** Urban Sports has the exclusive right to subcontract the provision of any of the Management Services to third parties, subject to the approval of SWAC of any proposed subcontractor, which approval shall not be unreasonably withheld. Urban Sports shall remain fully liable hereunder for the performance of this Agreement. Notwithstanding any such subcontract, Urban Sports will be solely responsible for engaging, coordinating, supervising, and paying all subcontractors engaged with the authorization of Urban Sports. The SWAC will have no liability in the event of a subcontractor's non-performance.

14. **Representations and Warranties.**

a. The SWAC represents and warrants to Urban Sports that (i) it has the right to enter into this Agreement and to perform each of its obligations pursuant to this Agreement without violating the rights of any person or entity; (ii) Member Institutions have previously granted the SWAC in writing the right to enter into and to perform this Agreement according to its terms; (iii) Urban Sports' performance of the Management Services in accordance with the terms and conditions hereof will not infringe upon or violate the rights of Member Institutions or any other person claiming by, under or through the Member Institutions; and (iv) the SWAC will not do anything which might interfere with or impair Urban Sports' rights hereunder.

7

b. The SWAC acknowledges and agrees that Urban Sports' rights in this Agreement are valuable and unique. The SWAC warrants that it will not (i) authorize or permit any other exhibition or distribution of the services outlined herein by any medium in any manner or by any means whatsoever without the prior approval of Urban Sports; and (ii) take any action or grant any rights inconsistent with the rights granted to Urban Sports herein.

c. Urban Sports represents, warrants and agrees that (i) Urban Sports has the right to enter into this Agreement and to perform all of its obligations pursuant to this Agreement without violating the rights of any person or entity; and (iv) Urban Sports will not do anything which might interfere with or impair the SWAC's rights hereunder.

d. Urban Sports acknowledges and agrees that the rights of the SWAC in this Agreement, and which are granted to Urban Sports, are valuable and unique. Urban Sports warrants that it will not (i) authorize or permit any exhibition or distribution of the services outlined herein by any medium in any manner or by any means whatsoever, except in compliance with this Agreement or with the prior written approval of the SWAC; and (ii) take any action or grant any rights inconsistent with the terms of this Agreement or the rights granted to Urban Sports herein.

## 15. **Indemnification**.

a. The SWAC will indemnify, defend and hold Urban Sports and its affiliates, and its and their respective owners, shareholders, members, managers, directors, officers, employees, agents, representatives, heirs, licensees, successors and assigns, (each an "Urban Sports Indemnified Party" and collectively the "Urban Sports Indemnified Parties") harmless from any and all claims, costs, liabilities, judgments, expenses or damages (including without limitation reasonable attorneys' fees), whether threatened or actual, arising out of or in connection with (i) the performance or nonperformance of this Agreement by the SWAC; (ii) any breach or alleged breach of this Agreement by the SWAC or of any representation or warranty made by the SWAC, for itself or on behalf of its Member Institutions; (iii) the negligent acts or omissions or willful misconduct of the SWAC or its employee, agents, or affiliates; (iii) any material, including without limitation commercial, promotional or other material, furnished to Urban Sports by the SWAC in connection with the Management Services; except to the extent the act or omission giving rise to the need for indemnification under this Agreement was caused by the negligence or willful misconduct of an Urban Sports Indemnified Party; provided, however, that the SWAC's liability under this Agreement will not include the payment or reimbursement to any Urban Sports Indemnified Party of any indirect or consequential damages arising from a breach of this Agreement by the SWAC.

b. Urban Sports will indemnify, defend and hold the SWAC and its respective affiliates, owners, shareholders, members, managers, directors, officers, employees, agents, representatives, heirs, licensees, successors and assigns (each a "SWAC Indemnified Party" and collectively the "SWAC Indemnified Parties"), harmless from any and all

8

claims, costs, liabilities, judgments, expenses or damages (including without limitation reasonable attorneys' fees), whether threatened or actual, arising out of or in connection with (i) the performance or nonperformance of this Agreement by Urban Sports or any authorized agent thereof; (ii) any breach or alleged breach of this Agreement by Urban Sports or any authorized agent thereof or of any representation or warranty made by it herein; (iii) the negligent acts or omissions or willful misconduct of Urban Sports or its employees, agents, or affiliates; (iv) any material, including without limitation commercial, promotional or other material, furnished to the SWAC by Urban Sports in connection with the Management Services; except to the extent the act or omission giving rise to the need for indemnification under this Agreement was caused by the negligence or willful misconduct of a SWAC Indemnified Party; provided, however, that Urban Sports' liability under this Agreement will not include the payment or reimbursement to any SWAC Indemnified Party of any indirect or consequential damages arising from a breach of this Agreement by Urban Sports.

c. In any case in which indemnification is sought hereunder:

   (i)     the Party seeking indemnification will promptly notify the other of any claim or litigation to which the indemnification relates; and

   (ii)    the Party seeking indemnification will afford the other the opportunity to participate in and, at the other Party's option, fully control any compromise, settlement, litigation or other resolution or disposition of such claim or litigation.

d. The indemnification obligations provided in this Section 15 will survive the expiration or termination of this Agreement.

16.   **Force Majeure**. If performance by any Party of any obligations hereunder (including the staging or the coverage of any of the SWAC Mobile Marketing Tour stops) should be delayed, prevented or canceled due to any act of God, inevitable accident, strike or other labor dispute, flood, tornado, hurricane, fire, war, act or threat of terrorism, riot or civil commotion, government action or decree, or for any other reason the Parties agree is beyond the control of such Party (a "Force Majeure Event"), then such Party will not be in breach of its obligations with respect to such prevented performance, but all other rights and obligations of the Parties hereunder will remain in effect and will not be affected thereby in any manner; provided, however, that if the staging of any Tour hereunder is prevented or canceled due to a Force Majeure Event, then with respect to the event so prevented or canceled, the SWAC shall be responsible for reimbursing Urban Sports for only those expenses incurred by Urban Sports through and including the date of such cancellation.

17.   **Insurance.**

   a. During the Term, the SWAC will maintain, at its expense, commercial general liability insurance coverage (including contractual liability coverage) and automobile liability insurance coverage on all owned, non-owned and hired vehicles, with combined coverage limits of no less than One Million Dollars ($1,000,000) per

9

\12690756.2

occurrence and Three Million Dollars ($3,000,000) in the aggregate. The following entities will be named as additional insured under such policy(ies): Urban Sports, and each of their respective affiliates and their respective shareholders, members, managers, directors, officers, partners, employees and agents.

b. During the Term of this Agreement, Urban Sports will maintain, at its expense: (i) commercial comprehensive general liability insurance coverage (including contractual liability coverage) with coverage limits of no less than One Million Dollars ($1,000,000) per occurrence and Three Million Dollars ($3,000,000) in the aggregate. The following entities will be named as additional insured under such policy(ies): The SWAC and each of their respective affiliates and their respective shareholders, members, managers, directors, officers, partners, employees and agents and each other.

c. Each Party will maintain statutorily required workers compensation and/or employer liability insurance coverage for their respective employees.

## 18. **Miscellaneous**

a. Notice. When this Agreement requires a Party to deliver any notice or other document, such notice or document will be deemed duly delivered if actually delivered, if mailed by United States mail (or commercial courier) postage prepaid within three (3) days of deposit, or on the confirmed receipt of a facsimile to the following addresses:

To Urban Sports: Urban Sports & Entertainment Group, LLC
 19600 W. Catawba Ave. Suite 301-C
 Cornelius, North Carolina 28031
 Attn:  Thomas P. Grabowski
 Facsimile:  (704) 894-9169

To SWAC: Southwestern Athletic Conference.
 Administrative Office
 2101 6th Avenue North, Suite 700
 Birmingham, AL 35203
 Attn: Duer Sharp
 Facsimile:

Any Party may change its mailing or facsimile address by delivering written notice in the manner provided above of a new address to the other Party.

b. Successors and Assigns. Neither party may transfer, assign or delegate any right or duty under this Agreement to another entity or person without the prior written consent of the other party, provided that in the case of a sale of all or substantially all of the assets of a party, such consent will not be unreasonably withheld, conditioned or delayed. As a condition to any such assignment, such assignee must agree to be bound by all the terms and conditions hereof to the same extent as its assignor hereunder.

10

c. Governing Law. This Agreement is to be governed by and construed in accordance with the laws of the State of Alabama without regard to conflicts of laws principles. Each Party hereby consents to the jurisdiction of the courts located in Birmingham, Alabama (specifically, the United States District Court for the Northern District of Alabama and the Birmingham Division of the Circuit Court of Jefferson County), and irrevocably agrees that all actions or proceedings arising out of or relating to this Agreement, or the relationship between the Parties, shall be litigated in such courts. Each party for itself and on behalf of its affiliates accepts for itself and in connection with this amendment, generally and unconditionally, the exclusive jurisdiction of the aforesaid courts and waives any defense of forum *non conveniens*, and irrevocably agrees to be bound by any judgment rendered thereby in connection with this Amendment.

d. **THE PARTIES HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE THE RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING OR COUNTERCLAIM OF ANY TYPE AS TO ANY MATTER ARISING DIRECTLY OR INDIRECTLY OUT OF OR WITH RESPECT TO THIS AGREEMENT, OR ANY OTHER DOCUMENT EXECUTED IN CONNECTION HEREWITH OR THEREWITH, AS WELL AS ANY OTHER CLAIM OF ANY KIND WHATSOEVER BETWEEN THE PARTIES, REGARDLESS OF THE SOURCE OF THE DISPUTE; AND THE PARTIES AGREE THAT ANY OF THEM MAY FILE A COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE KNOWING, VOLUNTARY AND BARGAINED FOR AGREEMENT BETWEEN THE PARTIES IRREVOCABLY TO WAIVE TRIAL BY JURY, AND THAT ANY DISPUTE OR CONTROVERSY OF ANY KIND WHATSOEVER BETWEEN THEM SHALL INSTEAD BE TRIED IN A COURT OF COMPETENT JURISDICTION, AS CHOSEN BY THE PARTIES HEREIN, BY A JUDGE SITTING WITHOUT A JURY.** EACH PARTY FURTHER WARRANTS AND REPRESENTS THAT EACH HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL, AND THAT EACH KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.

e. Headings. The descriptive headings of the several sections and paragraphs of this Agreement are inserted for convenience only and do not constitute a part of this Agreement.

f. Entire Agreement. With respect to the subject matter hereof, this Agreement and the Schedules attached hereto supersede and cancel all prior negotiations, writings, commitments and understandings, if any, between the Parties and contains the entire agreement between the Parties hereto and may not be modified except in a writing signed by all Parties.

g. Severability. The invalidation of any section, or part thereof, of this Agreement, by operation of law or otherwise, will not affect the validity and enforceability of any other remaining provision.

11

h. <u>Limitation of Liability</u>. Notwithstanding any other provision of this Agreement, in no event will any Party be liable to the other for loss due to special, indirect, incidental, or consequential damages, whether a claim therefor be based in contract, tort, negligence, strict liability, or otherwise.

i. <u>Counterparts</u>. This Agreement may be executed in one or more counterparts, each of which will be deemed an original but all of which together will constitute one and the same instrument.

j. <u>Waiver; Amendment</u>. All modifications, amendments and waivers must be in writing and signed the Parties. The rights and remedies of the Parties to this Agreement are cumulative and not alternative. The failure by any Party to promptly exercise a right hereunder or to seek a remedy available hereunder because of a breach of this Agreement will not be construed as a waiver of that right or a waiver of any remedy for that breach or any future breach of this Agreement.

k. <u>Independent Contractor</u>. It is understood and agreed that the Parties hereto at all times are acting and performing as independent contractors in providing services to each other as provided herein, and neither Urban Sports nor the SWAC will direct the manner or the method by which the other Party provides such services except pursuant to this Agreement.   The Parties hereto do not intend to create an employment, joint venture, partnership or agency relationship between or among themselves.   The Parties acknowledge that they are independent contractors for all purposes.   Neither Party, nor any of its officers, directors, members, managers, employees, independent contractors, agents or representatives, will have any claim under this Agreement or otherwise against the other Party for vacation pay, sick leave, retirement benefits, Social Security, workers' compensation, disability, employment insurance benefits or employee benefits of any kind.   Each Party is solely responsible for compensating its officers, directors, members, managers, employees, independent contractors, agents and representatives who provide services to the other Party under this Agreement.

l. <u>Construction</u>. The Parties acknowledge and agree that this Agreement is the product of negotiations among the Parties and further agree that no inference in favor of, or against, any Party shall be drawn from the fact that any portion of this Agreement has been drafted by or on behalf of such Party.

[Signature Page(s) to follow]

12

\126907562

**IN WITNESS WHEREOF**, each of the Parties hereto has duly executed and delivered this Agreement as of the date first written above.

URBAN SPORTS & ENTERTAINMENT GROUP, LLC

By: _____

Thomas P. Grabowski
CEO/President, Manager, & Member

**SOUTHWESTERN ATHLETIC CONFERENCE**

By: _____   7. 21. 15

Duer Sharp
Commissioner

Signature Page
Rights Agreement

:12690756.2

## SCHEDULE A

Member Institutions

- Alabama A&M University
- Alabama State University
- Alcorn State University
- University of Arkansas-Pine Bluff
- Grambling State University
- Jackson State University
- Mississippi Valley State University
- Prairie View A&M University
- Southern University
- Texas Southern University

## SCHEDULE B

### 2015-2016 SWAC Budget

| | | |
|---|---|---|
| *USEG Management Fee* | $ | 150,000.00 |
| Sponsorship Solicitation & Development | $ | 115,000.00 |
| *Consultation & sponsor solicitation* | | |
| *Attend sales meetings* | | |
| *Create sales decks* | | |
| *ROI reports* | | |
| *Client management* | | |
| USEG Project Manager/Consulting | $ | 15,000.00 |
| Football & Basketball Championship Travel | $ | 10,000.00 |
| General Administrative Costs (Copying, Shipping, etc.) | $ | 10,000.00 |

## TOTAL BUDGET                      $ 150,000.00

**Payable in four equal installments of $37,500 due:**
**August 1st, November 1st, February 1st, May 1st**

## SCHEDULE C

SWAC Existing Sponsors and Revenue

**Coca Cola - $50,000 annually through 2016**
**Nike - $5,000 in retail value trade annually through 2015 – no cash**
**Russell Athletics - $100,000 cash plus retail trade value annually**
**ESPN - $$345,000 for 2014-15, 365,000 for 2015-16, and $375,000 for the 2016-17 contract**
**year**

**SCHEDULE C**

<u>SWAC Trademarks</u>



**[INSERT SWAC CHAMPIONSHIP LOGO]**

\12690756.2

**SCHEDULE D**

Urban Sports Trademarks

